Your Honors, may it please the Court, my name is Courtney Williams and I am here on behalf of the petitioner Barbara Berry. I would like to try and reserve about five minutes for rebuttal if we can all work that out. Barbara Berry is a Mexican farm cooperative located in Miyawaki, Mexico. They are primarily in the business of cultivating raspberries for commercial sale. Barbara Berry contracted with the respondent, a nursery, Spooner Farms, who is a Washington corporation for the purchase and sale of raspberry root stock. The principal issue that we are here today for is whether the United Nations Convention on Contracts for the International Sale of Goods applies to this particular party's contract. It's a party where the two parties are international, and it is for the sale of goods, obviously, as I discussed. When, in your view, was the contract formed? When was the contract formed? When did you get your offer and acceptance? Under the CISG, offer and acceptance is a rigid, it's formatted in a rigid way. Under Article 14, an offer to conclude a contract becomes effective if it is sufficiently definite, meaning it states the type of goods, and it fixes either impliedly or expressively the amount of goods at issue as well as the price. And it also needs to make sure that it expresses the party's intent to be bound, the offeror's intent to be bound. Under Article 15, the offer is effective when it reaches the offeree. And our position is, because of this, that the verbal communications between December 12th and December 26th equaled the contract. Article 11 states that there's no particular form needed for a contract under the CISG, and thus it can be oral as opposed to the UCC in this case. We would posit that the email from Barbara Berry on December 26th clearly indicated that they had had prior telephone conversations when those three important terms were discussed. And by the 26th, they had moved on to even more detail of the contract regarding selling the stock and whatnot. So I would definitely state that the contract was established in December. I have a question for you about Article 4. Your basic theory, as I understand it, is that this is an issue of contract formation, whether this limitation on liability ever was agreed to. And the district court and your opponent take the position that it's a question of validity of a provision of the contract. Correct. And in Article 4, Part A, it says, except as otherwise expressed, I'm going to leave out the beginning of it, but then it goes on to say, except as otherwise expressly provided in this convention, it is not concerned with the validity of the contract or any of its provisions or of any usage. And the reason I'm asking you about that is it appears to me that what they're saying is that this kind of limitation on liability was a usage or a provision that would be, and the question is whether that usage is a valid part of the contract that was formed. So how do we decide under Article 4A whether this particular question is a question of contract formation or a question of the validity of a provision or usage? I think basically you would definitely need to start with the fact that in any contractual analysis, you have to first and foremost decide whether those terms are part of the contract. And if the terms are not part of the contract, you cannot get to a question of usage, validity, or enforcement. The district court didn't go through any analysis of contract formation under the CISG in this case. And because of that, and when it jumped straight to a question of validity, it then did look at usage, but it did so incorrectly. It didn't take into account any of the articles. Well, yeah, I guess what's difficult for me about this is that your position on contract formation is very rigid. Once the price term is set and the nature of the goods and the number of the goods and the basics are set, the contract is formed, period. It's done. And so it seems to me in that sense there is no question of contract formation. There's a contract. Both parties agree that there's a contract. Correct. So if I may say, are you asking then how we look at whether this is a usage and if it does somehow affect the contract? Well, yes. I guess in the situation where both parties agree that a contract was formed for the sale of particular goods, and the question is whether one provision or usage is or isn't in there, I'm wondering how the convention is trying to treat that and whether that question is even open after our previous case on the matter. Correct. Well, I would posit that once you have a contract, any terms that are introduced after the contract are obviously going to somehow modify the contract. And if they are material terms, meaning they discuss quantity, quality, price, or as I believe Article 19 states, if they discuss the liability of one party, those are material terms. And as you mentioned, the Court did go through that analysis in its Chateau des Charmes case, and it held that if you're going to materially alter a contract, you have to have express consent, express assent and an agreement of the parties. Now, if this, if the Court were to have held or if it were to be interpreted that this usage is a part of the contract under Article 9, that is the parties impliedly have already agreed to this once they form a contract, then that would essentially negate your argument, would it not? If that was the case, yes. But that's not the case in this particular circumstance. Basically, the district court ignored numerous international cases stemming mostly from cases arising out of the German as well as the Austrian appellate court as well as Supreme Court. And all of the cases, I did cite them in my brief, deal specifically with how a usage may be incorporated impliedly into a contract. And none of them support impliedly incorporating this usage into this contract. Basically, one party cannot unilaterally assert that a usage is part of a contract. The Court has to look at the fact of if it is widely known and widely used by parties to that, to that type of international trade. That was a German appellate court out of Frankfurt in 1995. Another court has held that usage may be applicable if the foreign party does business in a particular country only on a regular basis. And that is not the fact here. Barbara Berry had never done business with the Washington Corporation, let alone a corporation in the United States when it purchased rootstock. It had only ever purchased rootstock from a university in Mexico, and at that time no warranties were included in that contract. Various courts have also held that a usage may only apply if the party has a place of business in the geographical area where the usage is applied or if it permanently deals with parties in that same area. None of this is on point with the relationship between Barbara Berry and Spooner. Those are the Austrian appellate court and Austrian supreme court cases that were decided in 1995 as well as 2000. Basically, to kind of sum that up, an Austrian supreme court in 1998 stated that a party to an international sales contract has to be familiar only with those international trade usages that are commonly known and regularly observed to parties of the similar type of contract in his or her place of business. The district court, nor Spooner, introduced evidence that this type of usage or warranty or any sort of clause relating to the limitation of liability was used in Mexico. And, in fact, Spooner didn't present any evidence that this was known outside of Washington State. Its exhibits, O, P, and Q, I believe, attached to ER 11, particularly deal only with Washington State nurseries. Spooner had the burden to explain and to present a usage, and it failed that burden. The Austrian and German courts have both held that. And so in this case, Your Honor, I would bring it back and I would state that the question of usage is a nonissue if we look at international precedent, which, of course, is binding or, excuse me, is not binding but is used as guidance in CISG cases. I think it's very important also to look at Chateau de Charm, a case that the district court never mentioned, didn't even go into despite extensive briefing on Barbara Berry's behalf. And that court specifically went through a question of contract formation and then seeing whether the terms in the 11 invoices submitted after the oral contract was concluded to see whether that invoice term was included in the party's contract. And it held that it wasn't. And specifically it held that there's nothing in the CISG that allows silence or inactivity to equal an express assent to including a term that materially alters the contract. And that's precisely what the district court didn't address, and that's what Spooner is asking this Court to basically forget or to fudge around. And usage is not an issue. It's over. Kennedy, you may want to save some time for rebuttal. Is it your client's position that the oral agreement was formed at a particular time with particular terms, or is it just that there's an issue of fact as to what the agreement was that was reached under the CISG? I think that we have to remand or that we should vacate the summary judgment and remand for the Court to go through a different type of analysis. I think that both of those are very good positions. We would state that an oral contract was established in December, and per 18-2, an oral offer must be immediately accepted. And that's precisely what happened. And that happened before December 26th. And we would then go on to state that the case should be remanded after the decision is reversed, and this Court should be able to, as a matter of law, when it applies the CSI, when it applies the convention, basically, that it does apply and that the terms included in Spooner's invoice were not part of the party's contract. Is there any issue of fact over whether an invoice was put into the hands of your client before the 26th? Excuse me. Yes, there are numerous issues of fact regarding the exchange of documents that the district court did not acknowledge. If we go to the CISG, you have to acknowledge that under 14, an offer has to be delivered to a particular person, the offeree. And in this case, the December 12th email that Spooner sent to NorCal Nurseries didn't mention Barbara Berry and was not sent to Barbara Berry. So there's an issue of fact as to whether that amounted to an offer. We would say that it does not. There's further issues of fact regarding whether when it sent the invoice and the documents to DHL for the purpose of shipment and accepting the goods as the custom broker, whether that actually made it to Barbara Berry. We believe that DHL had no duty to pass those documents along to Barbara Berry. They were there, presented to DHL only for the purpose of accepting the goods as the custom broker. DHL was the company picked by Spooner. There are further issues regarding whether sending the invoice to SunVal at a later date constituted notice. Counsel, I understood Judge Canby's question to be quite specific, and I'm not sure I've heard an answer to it, which is whether there's any question of fact as to whether an invoice or other statement of a limitation of liability made it into the hands of your client before December 26th. We would say no. There is no issue of fact in that case. However, the district court failed in its analysis to run through all of the issues and to discuss that properly. I would like to reserve a little bit of time for rebuttal. You may. Thank you. Okay. We'll hear from Mr. Chisholm. Good morning, Your Honors. My name is Drew Chisholm. I am an attorney for Spooner Farms. I'm quickly going to run through the UCC as applied by Washington law, if you'd like me to, or I can speak by myself. No, I'd like to actually ask you somewhat similar questions that I asked opposing counsel. It seems to me that, to some extent, in view of our prior precedent, the question, in my mind anyway, is whether under Article IX there was an implied term incorporated into the contract whenever it was formed. And if that is the case, then it's no longer a question of contract formation. And what I'm interested in and what concerns me about your position is whether the evidence that you've presented is sufficient to create an issue of fact as to whether the limitation on liability is widely known in international trade rather than domestic trade. Okay. I will answer that question as far as CISG Article 9.2. But I'd also like to comment and I'll conclude with CSIG Article 18. There can be assent by silence, by conduct. And I've cited four cases in there. So what I'm saying is you can go by Article 9.2 saying, well, there's assent can be implied because the clause is customary or because it's a trade practice, meaning exchanging sales terms after you have a normal contract. And then I'll go on to Article 18. As far as 9.2, there are really I consider two subcategories to that. One, if a clause is customary in the industry, it can be added without assent. Spooner Farms did offer from other nurseries in Washington to make sales in Canada, basically the identical exclusionary clause. And, of course, we need to keep bearing in mind what the sale is. This is planting stock about the size of my hand. It's sold and then farmers take it and they grow it and they hope that there's a harvest. So from just a practical standpoint, this would have to occur. No one selling planting stock is going to guarantee that the farmer will have proper planting techniques, soil conditions, good weather, that the plant is going to grow. It's not going to affect other plants. It's going to yield a harvest. In this case, the second year after a first year that hailstorm. Barber Berry did not put anything in response for a nursery saying where there was basically a guarantee without the limitation of liability clause. Let me just make sure, Andrew, said that your evidence then concerned not just domestic sales, but sales between Washington State and Canadian buyers. For instance, Sakuma was one of the other sellers. And even if you throw all of that out, still looking under Article 9.2, I put a case in page 39 of the appeals that's a 1939 case out of Utah. And it was basically whether the seed dealer, whether a disclaimer of warranty was enforceable. And I quote, Every seed dealer that I know of has the same rule and the customer is not limited to Utah. It is international. And that's the quote from that particular case. The second prong of 9.2 is if the trade practice is customary industry, such as exchanging general sales terms after the fact, that those terms are added with implied assent. And there's a Swiss case that I have on page 39 of the appeal brief that discusses this. Setting aside 9.2, even if the court were to say, well, this clause isn't customary or it's not customary for two commercial parties to agree on the essential terms in the later exchange sales terms related to that, even if the court were to throw that aside, under Article 18 it says that assent can be by an act, such as the dispatch of goods or payment of the price. Also, assent can be by conduct by the offeree indicating assent. I cite four cases in page 27 of the European cases. The first case is a 1993 case. I won't try and name it because I'll butcher it by pronouncing it. But this was a case where they have an oral contract form, and later on there are some terms that come, and it says you must receive notice of defect within 8 days. The court ruled this is an additional material term. Oral contract was formed. However, when you accepted the shipment, that was assent. And in this case, there was no prior course of dealing between the parties. And then another case that's out on page 29, this was where they modified the payment terms. And I quote that case because I think it's important because it's very hard to square, at least for me, CSIG and the articles in there where they first say, well, silence is an assent, and they go on and they talk about how such conduct, which is there weren't any words exchanged, is silent and it can be construed as assent. And what it says, this case said is Article 18 merely specifies the principles of good faith, which is the general principle of CSIG. As a recipient of a commercial letter or confirmation accepts the communication without objection, he must account for the content of the letter and the contract is assumed to be implicitly modified according to the letter so long as the sender, under good faith, was entitled to regard the silence of acceptance. Well, here you have, and I can discuss a little bit the multiple times the original invoice was sent out. After the first original invoice was sent out, about a week afterward, the plan says, could you change the billing party to our import agent? So my client says, fine, we'll change it. So we have to do another batch of original invoices to be sent out because this has to go to customs or otherwise they're not going to let plant material through. And it's followed up by an e-mail saying, this is where it's going. Thanks for changing it. So under your construct, the contract was not yet formed in December, correct? My construct is it doesn't matter, is that if an oral contract was formed in December, it can be modified through either Article 9.2, assuming CSIG applies, or Article 18, as it provides in Article 18, the case is interpreting in my brief. Do you agree that this particular contract formation has to be assessed under CISG? And if so, did the district court assess contract formation under that charter? The first part, do I agree? No, I do not. I think that under Article 4, it talks about it can't be used to detect the validity of a provision, and I think that is. But to answer your second part of the question, did the court assess whether CSIG applies? The court basically, when it dismissed it on summary judgment, said, okay, if CSIG didn't apply, it should be dismissed because of the timberline and unit search holdings here recently in the Washington Supreme Court. And if CSIG does apply, there was assent through Article 18, or it was implied through Article 9.2. So basically, it's an alternative dismissal. It didn't specify which it was relying upon. A couple things as far as the invoice that were sent out. The first one was sent out, the original, on February 17th. After this change I mentioned about requests by the defendant, the original was sent February 25th. It's also important to note that when these boxes came, these 63 boxes of planting stock, it hasn't bright red on top of the boxes the exclusionary clause yet again. And at least one of the four cases that I mentioned interpreting Article 18.1 says, you know, by accepting the shipment and putting it to use, that's assent. Well, they open up the boxes where it says what the limitation of liability is, took the plants and planted them. They could have easily said, well, hold on, this isn't what we thought the deal was. My client didn't hear from them until a year later after a hailstorm that disrupted their first year when their second year harvest allegedly wasn't as fruitful. Excuse me. If I remember the facts correctly, there's a reasonably significant time period between the shipment of the first load, if you will, and the required date for planting. So there was a period of time during which they could have objected it didn't have to plant the day it arrived, I guess. Yes, that's correct. The shipment was three weeks or something. The plants arrived in March 4, 2004. And they had requested them by the 20th or some later date in the month. I can't recall that. Another thing that I think is worthy to point out, I mean, I don't think any jury can reasonably conclude that they didn't have an opportunity to read these at some point in time, but the declarations that were filed by the plaintiff, Gonzalez, and Barbara Berry said they never received the original invoice. I have never seen the backside of the invoice. Let's put aside that it was written on top of the boxes. Well, in their initial disclosure, which initial disclosures went at the same time between the parties, they provide a copy of the backside of the invoice. I mean, the invoice, no one can reasonably conclude that it did not get to them, because sent the first time, they say we need it to be changed, need a different billing party, sent a second time. Then they also say not only send the originals a second time, but would you fax it to our import agent, Zeta at SunBell, which was done. And custom requires it. The plants aren't going to get to them without an original invoice. That's why the client does basically four original invoices and sends it on. I have nothing further unless the Court has any questions. It doesn't appear that we do. Thank you. Thank you. And, Ms. Williams, you have about a minute remaining. I guess I'd first like to start with the question of whether there was a contract form in December or later. And counsel said that it didn't matter. But, in fact, it does matter, because this is a case that we have to look at contract formation. And if these terms were part of the contract, or if they were later added terms that essentially altered the terms of the contract in a material way. And if that is the case, you have two different ways to go. This case in Chateau de Charm held that nothing in the CISG allows silence or inactivity to equal assent to a contract or to an offer of a term that would materially alter an otherwise valid contract. And yet there – But I understand their argument to be that there is more than silence, because there are acts, performing acts, which would be under Article 18.3, that go beyond silence. So I understand them to be distinguishing Chateau de Charm by saying, well, we don't just have silence, whether you view it as initial formation or as the addition of a material term. We have affirmative acts, such as receiving the materials with the invoice and requesting a revised invoice, but not a revision of the term that you're now complaining of. There are several points to that. If it indeed – we want to look at whether later acts under 18.3 apply. You have to look at – again, I am going to go back to it. You have to look at Article 19 that says that the parties may alter their contracts by mere agreement. However, the CISG doesn't say that an act or an inactivity or silence equals that express agreement of the parties. You also need to look at – we would say – I don't understand that. 18.3 says the offeree may indicate assent by performing an act, such as one relating to the dispatch of goods or payment of the price, and that that would indicate assent. The CISG under Article 7 basically means that every single article needs to be woven together, and you can't look at one specific article or subarticle in a bubble. All of these must work towards the general principles of good faith, of uniformity, as well as the international character of the CISG. So when you look at 18.3, you also have to look at 18.1. You also have to look at 18.2. Then you have to go on to 18.9. It's almost like a ladder analysis. You don't just get to pick one and ignore the rest like the district court did. You have to look per Article 8, the totality of the circumstances. And in this case, the parties had no dealings before this. There is no evidence that they had ever come to a sustainable way of doing business together that would indicate that silence or inactivity, or even an act for that matter, such as payment of a price or opening a box, would equal assent to a term that was not proposed until after the contract was concluded, until after they paid for the goods. And at the time that they actually received the goods, you know, it was the term we do not dispute was on top of the boxes. It was delivered to Mexico. It was in English. It was opened who knows by whom, presumably Mexican workers on behalf of Barbara Berry. There are so many international questions of how these parties can deal together that you can't just look at a single factor. You have to look at everything. And moreover, I would go back to the point that Spooner has not carried its burden of showing that this is indeed a universally well-known practice. Canada is not Mexico. And what a Washington nursery does in relationship to a Canadian sale is not the same as what it does with a Mexican buyer. Is it your position that under Article 9.2, the international trade that's widely known has to specifically be approved for the country in question? Correct. Well, suppose that there are, this isn't this case, but just theoretically, suppose there are 49 other countries with which they've done business and everybody has always done it that way in all those 49 countries, and now somebody for the very first time in country number 50 comes along and says, hey, it's not widely known in international trade. I've never done it before. Why does it have to be in the specific country? Per the case law that I cited earlier, one of the threads running through each of those cases is the fact that because you are dealing with international parties who do have different laws in their different domiciles, knowledge is tantamount to any contractual relationship, that the parties have the duty to make sure that each party is on the same page, that they do have an understanding, and that there is good faith and a uniformity that is running through all of these contracts. And in a lot of the European cases, in fact, courts have held that, you know, if one party didn't know that this was an intent or a usage, and again, you can look at Article 8 to determine some of that, that those terms were not applicable. In fact, one of the cases cited by Spooner when a trade usage or a practice between the parties was upheld, it was because the Austrian seller, I believe, and the Swiss buyer both came from countries where the particular term was well known and widely used. And they were held to having a duty to follow that. However, if you get a seller or a buyer from two countries who have not previously worked together, the CISG and its principles and its purpose is to foster some sort of growth and additional trade, but you have to look at whether those parties are going to be able to contract well together. Thank you, counsel. I believe you've used up a lot of time, and we asked you a lot of questions, so that's quite reasonable. Thank you. Thank you. We appreciate the arguments from both counsel, and the case just argued is submitted.
judges: Canby, Graber, Gould